## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

RICHARD EBERLY and
PATRICIA EBERLY,

      Plaintiffs,

                                             Civil No. 04-0977 WJ/RLP

CARL MANNING, LEE Zillhart,
MARTHA Zillhart, MAGELLA MANNING,
CHRISTINA A. WIELAND, ZUNI MOUNTAIN, LTD,
a New Mexico Limited Partnership, and
LORENZO SANCHEZ,

      Defendants.

### MEMORANDUM OPINION AND ORDER
### DENYING MOTION TO DISMISS

      THIS MATTER comes before the Court upon a Motion to Dismiss for Lack of

Jurisdiction and for Insufficiency of Service of Process, filed on January 24, 2005 by Defendants

Carl Manning, Lee Zillhart, and Martha Zillhart (**Doc. 5**).    Plaintiffs filed this action in federal

court based on diversity jurisdiction.[1]  The complaint asserts the common law tort claims of

trespass, conversion and prima facie tort relating to damage done to Plaintiffs' property.

However, the real substance of the case is the almost palpable animosity between Plaintiffs and

_____

      [1]  Plaintiffs are residents of Arizona, and Defendants are residents of New Mexico and
Kansas.  The other Defendants in this case who are not involved in bringing the summary
judgment motion -- Zuni Mountain, Ltd and Lorenzo Sanchez -- are being sued for monetary
damages arising from fraud and misrepresentation connected to the sale of the land to Plaintiffs
(Count IV in the Complaint).  Plaintiffs' claims against these individuals have no bearing on the
amount-in-controversy issue, since damages cannot be aggregated to meet the amount in
controversy requirement of 28 U.S.C. § 1332.   Snyder v. Harris, 394 U.S. 332, 335 (1969);
Gallagher v. Continental Ins. Co., 502 F.2d 827 (10th Cir. 1974).

Defendants, who own neighboring properties.  Plaintiffs contend that Defendants are trying to drive them off their land, and Defendants contend that Plaintiffs are trying to cut off access to their homes by blocking a driveway easement which runs through the land.  The validity of this easement has been hotly contested by the parties both in state court in McKinley County as well as before the McKinley County Board of Commissioners.  Having considered the parties' briefs and the applicable law, I find that Defendant's motion is not well-taken and will be denied.

### Background

Some factual narrative will help clarify the issues which entangle the feuding parties. The narrative is chronologically presented, according to facts presented by both Plaintiffs and Defendants in order to make some sense out of the allegations in the complaint.

*The Parties and the Allegations*

Plaintiffs Mr. and Mrs. Eberly own lots 10, 11 and 12 in the Box S Subdivision to McKinley County, New Mexico, which was originally part of a family ranch owned by Christina Wieland and which eventually became the Box S Ranch Subdivision.  The Eberlys bought the three lots, comprising approximately eight acres, at different times from Ms. Wieland over the period of time between January, 1997 to March, 2002.  Defendants Martha and Lee Zillhart, residents of Kansas, own lot 20 in the same subdivision.  Carl Manning, a resident of New Mexico, owns lot 19, which is north of lots 10, 11 and 12.  Martha Zillhart and Carl Manning are siblings, and are children of Christina Wieland.

Plaintiffs have filed suit against Defendants for carrying out acts which have affected the integrity and value of their property, such as: blading a road through the property; destroying fruit trees; tearing up grass and vegetation by driving four-wheelers on areas that are clearly off

the disputed driveway easement; moving soil and filling a livestock tank.  Plaintiffs theorize that Defendants' conduct stems from their anger that their mother sold their family's land to Plaintiffs and other individuals, and that their harassment and threats of physical violence are attempts to force the landowners to give up their land.   As is usual in such cases, Defendants pleadings offer quite a different picture.

*The Driveway Easement & the State Court Case*

One of the causes for the hostility between the parties is a dispute over a 40' driveway easement which ran through several of the lots in the subdivision.  The easement runs through Plaintiffs' lots 10, 11 and 12  and provides access to lots 19 and 20.  According to Carl Manning ("Manning"), who had managed his mother's ranch land for years, the easement is an "old ranch road" which is indicated on USGS maps, Bureau of Land Management maps and visible National Aerial Photographs.  Manning Affidavit, ¶ 3.  A portion of the easement ran through lots 17 and 18 in the Box S Subdivion, which was owned by Mr. Paul Petranto ("Petranto").

In July of 2002, Petranto filed a lawsuit against Manning in state court in an attempt to vacate the easement.[2]  During the course of litigation, Petranto moved for a restraining order against Defendants Wieland, Manning and the Zillharts for misuse of the driveway easement, alleging that Defendants' real purpose was to harass Petranto and force him off his property.  In that motion, Petranto claimed that Manning came onto his property with unidentified persons and two dogs and assaulted a guest who was staying on his property; that Manning widened the gate going into Petranto's property, and put a lock on a cable across the gate; and that Manning and

---

[2]  Petranto is not a named party in this action, but the factual history shows that he is closely aligned with Plaintiffs.

the Zillharts threatened Petranto with physical injury.  The motion, filed by Mr. Stripp (who is

also the attorney for Plaintiffs in this action) included language which stated that "[i]f Defendants

are not completely prohibited from entering Petranto's property, then there is a real and

immediate danger of a confrontation that may result in Petranto being forced to use either

nondeadly or deadly force to protect himself . . . ."  Martha Zillhart Affidavit in Sup. of Mot. to

Dismiss, attachment C, ¶ 9.   As a result of the motion, the state court issued an Order allowing

Defendants to continue to use the road through Petranto's property.  See, Reply, Ex. C

(Temporary Restraining Order).

　　　　According to Defendants, during the course of the litigation the parties were also ordered

to have no contact with each other except through their attorneys.  Plaintiffs dispute that such an

order was ever issued.  Response at 6.  In support of their contention that such an order exists,

Defendants have produced a copy of a tape log from a state court hearing that took place on May

16, 2002, but no copy of a written court order.  Martha Zillhart Affidavit, Ex. E, p. 8, log number

561.[3]  In the reply brief, Defendants insist that the Order exists, but that it was not reduced to a

writing by the state court.  Reply at 9-10.

*The Board of Commissioners' Hearing*

　　　　In July of 2003, Petranto applied to the McKinley County Commissioners on the same

easement dispute.  Petranto was represented at the state court hearing by Mr. Stripp.  Mr. Eberly

("Eberly") testified in support of Petranto's position in the state court hearing as well as before

---

[3]   According to the docket retrieved from the Eleventh Judicial District's website for
McKinley County shows that the case, D-1113-CV-200200018, is still pending.  See also,Martha
Zillhart Affidavit in Sup. of Mot. to Dismiss, ¶ 3; and Oscar Lee Zillhart Affidavit, ¶ 2 (referring
to Case No. 1113 CV-2002 in the Eleventh Judicial District Court, County of McKinley, State of
New Mexico).

the Board of Commissioners.  The Board ruled that the easement is the only subdivision access to

lots 18, 19 and 20 and that vacating the easement would violate McKinley County Subdivision

Regulations.  The Board ultimately denied Petranto's request to vacate the 40' driveway

easement.  Manning Affidavit, ¶¶ 4-12; Clarke Affidavit, ¶ 9.

　　　　In August, 2004, Carl Manning and the Zillharts were driving along the easement when

they discovered that the easement was blocked by a very large pile of debris, dirt and rock,

including logs and wooden boards with nails under the surface of the road.   Manning also saw

what he took to be evidence of a steel track driven  heavy equipment both in the easement as well

as what appeared to be a possible home pad site on the Eberly property.  Manning Affidavit, ¶

13; Oscar Lee Zillhart Affidavit, ¶ 3 (hereinafter, "Lee" Affidavit).   Manning contacted the

police department and presented the officer who arrived on the scene with a copy of the

McKinley County Commissioners' ruling regarding the 40' driveway easement.   The officer

advised Manning to keep receipts of all expenses incurred while clearing the way.  Manning

asserts that he had to rent heavy equipment in order to clear the blockage, which took three days

and was very costly.  Part of the clearing evidently involved filling a "stock tank" which blocked

the easement.  However, Manning states that he did not knock down any trees in the process.

While clearing out the easement to gain access to his property, Manning was approached by

Petranto, who stated that Eberly had authorized him to prevent Manning from clearing the

easement.  Manning Affidavit, ¶ 16-20.  On January 6, 2005, Petranto himself approached

Defendants to serve process on them.  A more extensive description of the service process is

given below, see § III A.  These events have brought the parties here, to Defendants' motion to

dismiss.

## Discussion

Defendants seek dismissal of the case on three grounds: (1) lack of jurisdiction because Plaintiffs' complaint does not meet the threshold of the amount in controversy for diversity jurisdiction; (2) failure to exhaust their administrative remedies; and (3) insufficiency of service with respect to Martha and Lee Zillhart because these Defendants were never served with the summons and complaint.

## I.     SUBJECT MATTER JURISDICTION

Defendants argue that the sum of the matter in controversy does not exceed $75,000.00. The basis of their challenge is that considering the cost of the lots and the amount of damage that could possibly be attributed to destruction of vegetation and trespass, the damages sought by Plaintiffs cannot measure up to the required jurisdictional amount.

Rule 12(b)1 of the Federal Rules of Civil Procedure empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." When making a Rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends by relying on affidavits or any other evidence properly before the court. New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). A court has broad discretion to consider affidavits or other documents to resolve disputed jurisdictional facts under Rule 12(b)(1). Holt, 46 F.3d at 1003. In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a Rule 56 motion. Id. (citing to Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir.), cert. denied, 484 U.S. 986 (1987)).

Plaintiffs have the burden of demonstrating that it is not legally certain that their claims

are for less than the jurisdictional amount.  See, Adams v. Reliance Standard Life Ins. Co., 225 F.3d 1179, 1183 (10th Cir.2000).  The legal certainty standard is very strict.  Generally, dismissal under the legal certainty standard will be warranted only when a contract limits the possible recovery, when the law limits the amount recoverable, or when there is an obvious abuse of federal court jurisdiction.  Woodmen of World Life Ins. Society v. Manganaro, 342 F.3d 1213, 1216-17 (10th Cir. 2003).  Only if it is established **as a matter of law** before or during the trial that a plaintiff was not entitled to recover an amount sufficient to meet the jurisdictional requirement will a court lack subject matter jurisdiction.  Id. (emphasis added).

A.    Value of Plaintiffs' Claims Based on Property

Plaintiffs state that the total purchase price for the three properties is $58,330, based on their purchase price of $18,150, $18,400 and $21,780 including interest for lots 10, 11 and 12, respectively.  Plaintiffs add into that the value of a cabin which stands on lot 11 (valued at $16,000), a camper permanently installed on lot 11 (valued at $1,000), and the installation of a housepad and a stock tank (costing about $1,500).  The total value of their property with these "improvements" is $76,830.  The amount claimed by a plaintiff in pleadings in diversity actions ordinarily controls if the claim is apparently in good faith.  F & S Const. Co., Inc., v Jensen, 337 F.2d 160, 162 (10th Cir. 1964).  Defendants have raised several challenges to the integrity of Plaintiffs' calculations, some of which have merit and are persuasive, but are insufficient to overcome the legal certainty standard that favors plaintiffs who file diversity actions in federal court.

*(1)    Defendants' challenges to Plaintiffs' calculations of property value*

Defendants argue that the value of the Eberly property can reasonably be determined to be

no more than $50,000.00.  Defendants state that the actual purchase prices for lots 10, 11 and 12 were between $10,000 and $12,000.  Manning Affidavit, attachment A (contract showing purchase price of lot 11 as $10,000).  Defendants point out that the Plaintiffs' figures are inflated to include interest, which is the cost of borrowing money and should not be included in computing the jurisdictional amount.   The Court agrees with Defendants that Plaintiffs' representations of the value of their property should not include interest.  See, Greenfield v. U.S. Mortg. Co.,133 F. 784, 786 (D.C.Ark. 1904), cited in Frontera Transportation Co. v. Abaunza, 271 F. 199, 201 (5th Cir. 1921) ( the value of the lands, not the amount required to redeem, is the amount in controversy).

Defendants present documentation which establishes the combined value of Plaintiffs' lots to be approximately $18,000.00 Reply, Exs. A-1, A-2, A-3.  Defendants argue that the property has not been improved by any value except for the possible home pad site.   However, even including the value of the improvements as asserted by Plaintiffs, the total value of Plaintiffs' property is considerably short of the jurisdictional amount.

(2)      *Lot value as compared to alleged damage*

Defendants argue that the total value of the property should not be taken into consideration in calculating the jurisdictional amount because Plaintiffs do not allege that the property has been rendered worthless by Defendants' alleged conduct.  This point is well-taken. Plaintiffs' claims are based on trespass on property "outside the location of the driveway easement." Eberly Affidavit, ¶ 10 (Resp, Ex. 1).  The claims of conversion against Defendants Manning, the Zillharts and Christina Wieland  are based on damage to the Eberly property by "knocking down trees, tearing up grass and vegetation, moving and removing soil, and filling a

8

stock tank." Plaintiffs do not dispute Defendants' Fact No. 10, which states that counsel for Plaintiffs stated that Defendants have destroyed six apple trees and three walnut trees. Complaint, ¶ 13. By Plaintiffs' own representation, the value of the stock tank is less than $1,500. Eberly Affidavit, ¶ 5.

Other than damage to fruit trees, the stock tank and trespass on property near the easement, Plaintiffs have not alleged any basis for substantial loss in the value of their property. For example, there is no allegation that the log cabin, camper, or housepad site was damaged or devalued by Defendants' conduct. Plaintiffs' own claims of trespass are limited only to certain "portions" of Plaintiffs' property. Eberly Affidavit, ¶ 10 (Resp, Ex. 1). Nor are Plaintiffs seeking an injunction based on trespass, where the amount in controversy is measured by the value of the object of litigation. See, Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333, 347 (1977) (citations omitted). Thus, because the total value of Plaintiffs' property is less than $75,000.00, Plaintiffs would not be able to recover that amount based on damage to their property.

B.    Claims for Emotional Distress

If the issue of jurisdiction were confined to the damages Plaintiffs are seeking on property damage, the Court would dismiss the case for lack of jurisdiction. It should be clear from the above discussion that there is a legal certainty that Plaintiffs would not recover the jurisdictional amount if they prevailed. However, the inquiry cannot end there because Plaintiffs are also seeking damages in excess of $75,000.00 for significant emotional distress caused by Defendants' conduct. Eberly Affidavit, Ex. 1 to Response, ¶ 14.

In common law tort cases where plaintiffs can bring claims for pain and suffering , it

9

"becomes more difficult to determine" whether plaintiffs have met their burden.  Duchesne v.

American Airlines, Inc. 758 F.2d 27 (1st Cir. 1985) (citing Wright, Miller & Cooper).  In

Duchesne, the court reversed dismissal of plaintiff's claim based on failure to show the required

amount in controversy of $10,000 [at that time].  Plaintiff in that case presented evidence of lost

earnings and medical expenses in the amount of $2,250.[4]  Plaintiff had "sustained a physical

injury in the form of a brain concussion, consulted a number of physicians, and suffered

headaches and other symptoms of pain and discomfort "for a considerable period of time."  On

the basis of that evidence the First Circuit reversed the dismissal.  The court found that although

it was unlikely that plaintiff would be awarded $7,750 in pain and suffering, there was no legal

certainty that she would not recover that amount.  The First Circuit, however, compared the case

at bar with other cases in which it was decided that the jurisdictional amount was not reached by

plaintiff's claims for pain and suffering.  See, Jimenez Puig v. Avis Rent-A-Car System, 574

F.2d 37, 40 (1st Cir. 1978) (jurisdictional amount was not met by a claim for short-lived

embarrassment and anger resulting from a car-rental clerk's public destruction of plaintiff's credit

card and announcement that he had failed to pay his bills); Turner v. Wilson Line of

Massachusetts, 242 F.2d 414, 418-19 (1st Cir.1957) (dismissing claim for compensation for

seven to eight hours of headache, weakness, dizziness, nausea, and vomiting); Gill v. Allstate

Insurance Company, 458 F.2d 577, 578-79 (6th Cir.1972) (dismissing two plaintiffs' claims for

emotional "upset" on the grounds that "there was no evidence to link the alleged injury to

defendant's purported offensive activity and no evidence that plaintiffs had consulted any medical

personnel for diagnosis or treatment").

_____

[4]  Plaintiff's injuries caused her a two-month delay in starting up her business.

As the basis for their damages for emotional distress, Mr. and Mrs. Eberly allege only that the harassment and property damage caused by Defendants have delayed their plans to build their retirement home on one of the lots "and otherwise adversely affecting our lives."  Eberly Affidavit, ¶ 12. The Court finds it *extremely* unlikely they will recover that amount for emotional distress, based on the kinds of injuries they assert.   However, there is a "strong presumption" favoring the amount alleged by the Plaintiffs.  Woodmen of the World, 342 F.3d at 1216-17.  It is only because of this presumption that I find, for now, that the Court has subject matter jurisdiction over this controversy under 28 U.S.C. § 1332.

I caution Plaintiffs that this ruling is subject to review if it becomes evident as a matter of law either *before* or *during* the trial that Plaintiffs are not entitled to recover an amount sufficient to meet the jurisdictional requirement. See, Bd. of Cty. Comm'ners for Garfield Cty, Colo. v. W.H.I, Inc. et al., 992 F.2d 1061, 1063 (10th Cir. 1993) (Jurisdictional questions are of primary concern and can be raised at any time by courts on their own motion).   Plaintiffs should keep in mind that if they prevail at trial, but their recovery is less than the jurisdictional amount, the Court has discretion to deny costs to Plaintiffs, or impose costs upon them.  See, 28 U.S.C. § 1332(b).

II.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants contend that the ongoing dispute regarding the validity of the 40' driveway easement precludes this Court's jurisdiction over the case until the issue is resolved administratively before the McKinley County Board of Commissioners.  Defendants concede, however, that Plaintiffs' trespass claims are based on Defendants' alleged use of Plaintiffs' lots outside the location of the driveway easement.  Eberly Affidavit, Ex. 1 to Response, ¶ 10.

11

Plaintiffs assert that Defendants destroyed property in "areas which are clearly not within the alleged 'driveway easement.'"  Thus, this argument fails because the validity of the easement is not critical to the integrity of Plaintiffs' claims for trespass.

III.    INSUFFICIENCY OF PROCESS

Defendants contend that service as to Manning and the Zillharts was ineffective because it was attempted by Petranto, who had been ordered by the  state court to have no contact with Defendants except through their attorney.  They also contend that the Zillharts were never handed a copy of the summons and complaint.  Further, they challenge the timeliness of service. None of these arguments succeeds.

A.    <u>Ineffective Service</u>

The docket reflects three returns of service as to these three Defendants (Docs. 2, 3, & 4). The events that transpired on the day in question -- the day Petranto attempted to serve those individuals -- demonstrate that the dynamics among these neighbors have unfortunately spiraled downward to a point of no return.

Manning states in his affidavit that on January 6, 2005, he returned to his property (referred to as the "campsite") after ranch duties to find Petranto waiting for him.  Manning states that he reminded Petranto of the court's restraining order which prohibited contact between the parties except through their attorneys.  Petranto told Manning that he had permission from the court to enter the properties for the purpose of serving the summonses and complaints.  Manning Affidavit, ¶¶ 21-24.

The Zillharts' account of the same incident, based on their affidavits, starts out with the

12

Zillharts also driving back to the campsite in their new four-wheeler.[5]  Oscar Zillhart got out of the vehicle at one point and asked his wife to continue test-driving it, which she did.  Martha Zillhart was startled when Petranto jumped out from under a camper trailer and attempted to block the vehicle.  Fearing for her safety, she sped around him and continued down the road. Martha Zillhart heard her husband yelling at Petranto to stop.  Petranto started running back to his property while yelling that he had a right to be on the property and throwing papers on the ground.

Petranto's story, according to his affidavit (Ex. 2 to Response) is on January 6, 2005, he informed his attorney Mr. Stripp, that all three Defendants were on their property.  Petranto offered to serve the Defendants since he was more familiar with the rather remote location where Defendants were located.   Petranto drove out to Box S and entered Lot 19, approached Manning and served him with the summons and complaint.  He then approached Oscar Zillhart and served him with the summons and complaint.  When he approached Martha Zillhart, she jumped into her four-wheeler and attempted to evade service.  Petranto followed her, and Martha Zillhart turned the four wheeler around and drove straight towards him.  Petranto stepped out of the way and tried to place the summons and complaint on her lap as she drove by, but the papers fell off her four wheeler to the ground.   Petranto picked up the papers and returned to the Manning camp

---

[5]  It is not clear if the campsite the Zillharts were returning to is the one located on lot 19, Manning's property, or the Zillhart's campsite on lot 20.  Martha Zillhart stated that she was "returning to camp from further north of the camp site on lot 20." M. Zillhart Affidavit in Sup. of Mot. to Dismiss; see also, M. Zillhart Affidavit in Sup. of Reply, ¶ 3 ("coming down from property in Section 15. . . north of my campsite on lot 20); Lee Affidavit in Sup. of Mot. to Dismiss, ¶ 8 ("returning with my wife to our campsite," and finally, Lee Affidavit in Sup. of Reply, ¶ 2 ("headed back to camp. . . .").  Regardless, it appears that all three Defendants subsequently ended up on Manning's property.

13

to serve the Zillharts, but Carl Manning tried to stop the service by yelling at Petranto to "get the f - - k off [his] property." Petranto placed the summons and complaint on the four-wheeler a second time, which angered Manning. Manning started to shove Petranto and threatened him with violence. Petranto felt he had completed the service, so he headed toward his property. Manning continued to shove Petranto several times and knocked him to the ground. Petranto states that Manning entered Petranto's property and threatened to kill him. On the advice of Mr. Stripp, Petranto filed a complaint against Manning with the sheriff's office the following day.

The Court is not in a position to unravel inconsistencies which are not relevant to the issues being addressed, or to judge the credibility of the parties. Suffice it to say that the extent to which the underlying bad feelings have taken over the parties' conduct in this case is best demonstrated by each party's assertions that they fear the other for their physical safety. The Zillharts make much of being fearful of Petranto. Martha Zillhart stated that she "had no idea what [Petranto] was doing when he jumped out at me and based on his behavior of the past, of course I was concerned for my safety. He has mentioned the ownership of guns in a rather threatening manner." Martha Zillhart Affidavit in Sup. of Reply, ¶5. And Petranto likewise alleges that he feared Defendants. In his motion for a restraining order filed in the state court case, he stated that "Defendants' actions are putting Petranto into reasonable fear that he is in immediate danger of great bodily harm or death." Reply, Ex. C, ¶ 7.

Despite the varying accounts in the parties' versions of what happened on January 6, 2005, the issue of whether service has been effected upon the Defendants can still be resolved. According to the return of service, service was effected in person on all three Defendants on "Box S, Lots 19-20." (Docs. 2, 3 and 4, at 2). Manning concedes that Petranto handed him the

14

summons and complaint personally. Nothing in Defendants' affidavits contradicts Petranto's version that when he returned to Manning's property to effect service a second time, Defendants were together in that location.  Oscar Zillhart does not deny or dispute that he was handed the summons complaint – he simply neither admits nor denies any of the events following the initial encounter with Petranto, when Petranto allegedly threw papers on the ground (assumed by Defendants to be the summons and complaint).  See, Brief in Sup. of Mot. to Dismiss at 18 n.6.

As for Martha Zillhart, her Kansas residency does not preclude service being effected upon her personally, which is what Petranto was attempting.  See, Fed.R.Civ.P. 4(e)(2). Petranto's account of the service process strongly suggests that Martha was trying to evade service (which, given the bad blood that exists between these parties, would not be a farfetched conclusion).   If so, her efforts would have been futile.  See, Novak v.  World Bank, 703 F.2d 1305, 1310 n.14 (C.A.D.C.,1983) ("When a person refuses to accept service, service may be effected by leaving the papers at a location, such as on a table or on the floor, near that person") (citing Errion v. Connell, 236 F.2d 447, 457 (9th Cir.1956) and Wright & A. Miller, Federal Practice & Procedure §§ 1095, 1101, at 362, 384-85 (1969) (other citation omitted)).

As for Defendants' main argument was that service is not effected because Petranto was ordered not to have contact with them except through their attorney, this is a weak argument at best.  Even assuming the restraining order exists and that Petranto was unlawfully on Defendants' property, the Court finds no legal basis for the conclusion that Petranto's noncompliance with the restraining order automatically rendered service ineffective, when it was

otherwise valid.[6]  Violating the state court's restraining order may constitute contempt of the

state court, but such conduct has no relevancy to the issue of whether Defendants were personally

served in this case.  Defendants' proper recourse was to seek relief from the state court that

issued the restraining order.  Therefore, for the above reasons, I find that service was effective as

to all three Defendants.

B.     Timeliness of Service

       Defendants have sought dismissal as a result of Plaintiff's failure to serve them within the

120-day period allowed under Federal Rule of Civil Procedure 4(m).  Summons were issued on

August 31, 2004, the day the complaint was filed – but service was effected on January 6, 2005.

This is about one week over the 120 days allowed for service under federal procedural rules.

Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, a district court may dismiss an

action without prejudice if the plaintiff fails to serve the summons and complaint upon the

defendant within 120 days. See Scott v. Hern, 216 F.3d 897, 912 (10th Cir.2000).

       Under Rule 4(m), the court may, within its discretion, extend service rather than dismiss

the action without prejudice even if plaintiffs cannot show good cause for failure to effect service

within 120 days of filing the complaint.   Espinoza v. United States, 52 F.3d 838 (10th Cir. 1995)

(amendments to federal rules require district court to consider whether permissive extension of

time is warranted even if plaintiff fails to show good cause).  Relief may be justified, for

example, if the applicable statute of limitations would bar the refiled action, or if the defendant is

---

        [6] Defendants do not assert that Petranto's entry onto their property was unlawful except
on the basis of the restraining order.  Thus, Plaintiffs' reliance on § 208 of Restatement 2d Torts
(1965) for the proposition that an individual does not commit trespass in the act of serving
process, is not useful.

evading service or conceals a defect in attempted service.  See, Fed.R.Civ.P. 4(m) Advisory

Committee Note, 1993 Amendments.

Plaintiffs do not dispute that service was late.  They explain that the delay was due to the

fact that this is an "extremely contentious case,"  making service of process difficult.  Plaintiffs'

alleged evasiveness was also the reason why Petranto's attorney gave Petranto the summonses

and complaints when he was informed that the three Defendants were in a definite location at the

Box S Subdivision.  Based on the facts presented in the case, Plaintiffs' explanation is plausible.

The Court, *sua sponte*, finds it appropriate under the circumstances of this case, to extend the

time for service for 10 days from December 29, 2004.  Further, this ruling is effective *nunc pro

tunc*, and thereby renders service on Defendants to be timely.

IV.     PUNITIVE DAMAGES

Defendants contend that Plaintiffs' request for punitive damages is both without merit

and as such, cannot raise the level of the jurisdictional amount.  Defendants' argument on this

issue consists of a rehash of the facts in the case which have been presented in this memorandum

opinion.  The Court makes no findings here on the merits of Plaintiffs' request for punitive

damages.  Further, the Court need not pass on the issue of the effect of punitive damages on the

jurisdictional amount, since it has already been determined that the jurisdictional amount has

been met on the basis of Plaintiffs' other claims.

### Conclusion

In sum, the Court concludes that Plaintiffs have met the threshold amount for diversity

jurisdiction under 28 U.S.C. § 1332, at least for the present.  Defendants' alternative arguments

regarding exhaustion of administrative remedies and insufficiency of service fail for reasons

17

given above.  Finally, the Court does not pass on the merits of Plaintiffs' claims for punitive damages.

As explained above, the Court has questions regarding Plaintiffs' representations and calculations, particularly on the claims for emotional distress.  For this reason, the Court may find it necessary to revisit the jurisdictional issue at a later time.  The Court also cautions Plaintiffs that they may be subject to the imposition of costs should they succeed on the merits but recover less than the jurisdictional amount.

**THEREFORE,**

**IT IS ORDERED** Defendants' Motion to Dismiss for Lack of Jurisdiction and for Insufficiency of Service of Process, filed by Defendants Carl Manning, Lee Zillhart, and Martha Zillhart (**Doc. 5**) is hereby DENIED, for the above stated reasons.

_____
UNITED STATES DISTRICT JUDGE